DAVID PENN, Jr., Respondent, *v.* THE BUFFALO AND ERIE RAILROAD COMPANY, Appellant.

(GENERAL TERM, FOURTH DEPARTMENT, JANUARY, 1870.)

Where a special contract for the transportation of cattle at reduced rates, provided that the plaintiff (the owner), should load and unload at his own risk, the carrier furnishing necessary laborers to assist, under direction and control of the plaintiff, who was to examine for himself, all the means used, as to the sufficiency, quality, and condition thereof,—*Held*, that the agreement intended that the carrier should furnish the facilities for, and

Penn *v.* The Buffalo and Erie Railroad Company.

perform the labor of unloading, and the plaintiff direct and control the laborers.

*Held* further, that the carrier having neglected after request by the plaintiff to provide (as with reasonable care and diligence it might have done), facilities and laborers for unloading, during a delay of its cattle train by the way, and at a distance from its cattle yard, on account of a snow storm, and the cattle having been thereupon injured and damaged through confinement in its cars, was liable to the plaintiff for the damages sustained.

*Held* further, that it was not incumbent upon the plaintiff to unload the cattle upon the defendant's default; although by procuring materials for constructing platforms and bridges, and necessary assistance in constructing them and in unloading, he might have done so and thus prevented the damage.

And (per JOHNSON, J.) the circumstances of delay at a point where the carrier had no means or facilities for unloading stock, and where it could not, by reasonable care and diligence, obtain access for the train to its cattle yard for unloading, were not within the contemplation of the contract.

THIS was an appeal upon a case and exceptions from an order denying a motion for a new trial, and from the judgment entered in pursuance thereof.

The plaintiff sued to recover damages for injuries to his cattle, and the loss of several of them while the defendant was engaged in the transportation thereof on its railroad, from Erie, Penn., to Buffalo.

The cattle, some seventy-six head, were loaded in cars and came over the C. P. & A. R. R. to Erie, Penn., where they were taken by the defendant, as a common carrier, for transportation to Buffalo. They were also accompanied by one Barrow as agent for the plaintiff, and in whose charge they were. The contract under which the defendant undertook the transportation was as follows, viz. :

### STOCK CONTRACT.

CLEVELAND STATION, *Dec.* 8, 1866.

"Memorandum of an agreement made and concluded this day above named, by and between the Cleveland, Painesville & Ashtabula, Erie and North-east, Buffalo and State Line (afterward the Buffalo and Erie Railroad Company, the defend-

ant), railroad companies, of the first part, by their agent at the above named station, and Penn & Co., of Cincinnati, of the second part, witnesseth : That, whereas, the said railroad companies transported live stock only at first class rates, as per their tariffs, excepting only in cases where the owners assume certain risks and incidents specified below, in consideration of obtaining the transportation at reduced rates ; and whereas, the said party of the second part in the present case assumes and takes upon himself said risks and incidents for said consideration : Now, therefore, in consideration that said railroad companies will transport for the said party such live stock at the reduced rate of forty-five dollars for single decks and —— dollars for double decks per car load from Cleveland to Buffalo, and charges advanced, the said party of the second part does hereby agree to take, and hereby does assume all and every risk of injuries which the animals or either of them may receive in consequence of any of them being wild, unruly, vicious, weak, escaping, maiming or killing themselves or each other, or from delays, or in consequence of heat, suffocation, or the ill effects of being crowded upon the cars of the said railroad companies, or on account of being injured by the burning of hay, straw or any other material used by the owner for feeding the stock or otherwise, and for any damage occasioned thereby, and also all risk of any loss or damage which may be sustained by reason of any delay, or from any other cause or thing in or incident to, or from or in the loading or unloading said stock.

" And it is further agreed, that the said party of the second part is to load and unload said stock at his own risk, the said railroad companies furnishing the necessary laborers to assist under the direction and control of said party of the second part, who will examine for himself all the means used in the loading and unloading, to see that they are of sufficient strength and of the right kind, and in good repair and order.

" And it is further agreed between the parties hereto, that each and every of the parties riding free to take care and charge of said stock, do so at their own risk of personal injury

from whatever cause; and the said party of the second part, for the consideration aforesaid, hereby releases and agrees to release and to hold harmless and keep indemnified the said party of the first part of and from all damages, actions, claims and suits on account of any and every the injuries, loss and damage hereinbefore referred to, if any such occurs or happens.

" And this agreement further witnesseth, that the said party of the second part has this day delivered to said companies five car loads of cattle to be transported to Buffalo on the conditions, stipulations and understandings above expressed.

" Names of men passed in charge of stock : D. W. Barrow.

"A. HILLS, W. Station Agent. ·
D. PENN, by D. W. BARROW."

The train containing cattle reached Dunkirk, forty-two miles from Buffalo, in a severe snow storm on the 10th of December, 1866, at 11 o'clock, and was run upon a side track at some distance from the cattle yards and shutes for landing cattle. Barrow, the agent, told the conductor of the train that he wanted the cattle unloaded; and the evidence went to show a promise of the conductor to have it done. Barrow also made a like request of the cattle yard master. There was evidence to show that the train could not have readily been taken to the shutes for unloading; but there was also evidence to show that the cattle could have been unloaded by means of a movable platform, which could have been readily constructed and carried from car to car, by the employment of six men. The plaintiff's cattle were not unloaded until near noon of the ensuing day, and when taken from the cars, three were found to be dead, and the rest badly damaged and injured by confinement in the cars while not in motion. Barrow testified on his cross-examination in answer to a question, why he did not, himself, arrange planks for removal of the cattle himself, that it was not his business, and that he could have done so if he had tried. There was also evidence to show that the storm was severe, and that the snow drifted to such an extent that it was unsafe to move stock or freight

trains, and that orders were given not to move such trains until the storm should abate, which was on the third day after; that the snow was very deep and it required all the defendant's exertion to keep the road open.

The court instructed the jury that the contract set forth above, exempted the defendant from liability to pay for any damages arising from the delay in transporting the cattle, and from their detention at Dunkirk.

Also, that the defendant was, however, liable for the damages sustained by the cattle while detained at Dunkirk, provided they found, from the evidence, that the defendant was requested by the agent of the plaintiff to unload the cattle there, and could have unloaded them, by the exercise of due diligence, in time to have prevented the damages complained of; that, if such request was made, the defendant was thereafter bound to unload the cattle there, provided they could have been unloaded by the exercise of due diligence. To this part of the charge the defendant excepted.

Also, that the burden was on the plaintiff to prove that the defendant did not exercise such diligence, and that the injuries complained of arose therefrom.

The court was requested to decide that there was not any cause of action set forth in the complaint, showing that the damages arose from the omission of the defendant to unload the cattle at Dunkirk. The court refused so to decide, and the defendant's counsel excepted.

The defendant's counsel asked the court to instruct the jury that the plaintiff could not recover for the reason that the plaintiff's agent, who had charge of the cattle, and was with them at Dunkirk, testified that he could have unloaded the cattle where they stood, but that it was not his business. The court declined to so instruct the jury, and the defendant's counsel excepted.

The court was requested to instruct the jury that the plaintiff, under such circumstances, could not recover any damages that would have been prevented if he had unloaded the cattle himself. The request was refused, and defendant excepted.

*John Ganson*, for the appellant.

*Benj. H. Williams*, for the respondent.

Present—MULLIN, P. J., JOHNSON and TALCOTT, JJ.

By the Court—JOHNSON, J.   The only questions in this case arise upon exceptions to the charge, and to refusals to charge as requested.

The jury was charged that the defendant was not liable by reason of the contract between the parties for any damages arising from the delay in transporting the plaintiff's cattle from Erie to Buffalo, nor for their detention at Dunkirk. But they were further charged that the defendant was liable for the damages sustained to the cattle in consequence of their not being unloaded during such detention, if the jury were satisfied, from the evidence, that the defendant could, by the exercise of reasonable care and diligence, have unloaded the cattle there in time to have prevented the injury complained of, after defendant's agents were requested so to do by plaintiff's agent, and that such request was made.

That the defendant was bound, after such request, to unload the cattle at Dunkirk, during such detention there, if it could be done by the exercise of reasonable care and diligence. The defendant's counsel excepted to this portion of the charge.

This raises the question whether the defendant was charged with the duty or obligation of unloading the cattle, at the plaintiff's request, during their necessary detention at Dunkirk from the snow storm.   The jury by their verdict have found that the defendant's agents were requested to unload the cattle ; that it might have been done by the exercise of reasonable care and diligence on their part, and that the injury and damage were occasioned by their not being unloaded, and their consequent continued confinement in the cars, during the period of their detention.   It is contended by the defendant's counsel here, as it was at the circuit, that

the defendant was under no obligation whatever to unload the cattle; that the rights and obligations of the respective parties rested in the special contract; and that, by the provisions of the contract, it was the business of the plaintiff to unload the cattle, if such unloading became necessary for their protection and safety. This must depend upon the construction of that provision of the contract which relates to unloading the animals. That provision is as follows: " And it is further agreed that the said party of the second part is to load and unload said stock, at his own risk, the said railroad companies furnishing the necessary laborers to assist, under the direction and control of the said party of the second part, who will examine for himself all the means used in the loading and unloading, to see that they are of sufficient strength, and of the right kind, and in good repair and order." The meaning and intention of this provision are quite apparent. The defendant was, in the first place, to furnish and provide the means for unloading the stock, consisting of the necessary platform and shute, a passage-way to enable the cattle to descend safely from the cars. Second, the defendant was to furnish the necessary laborers to assist and perform the labor necessary in unloading, under the direction and control of the plaintiff. In short, the defendant was to furnish the facilities and perform the labor of unloading, and the plaintiff was to direct and control the laborers. The defendant was to unload under the plaintiff's superintendence and direction. The defendant was to do, and the plaintiff to direct and control as to the manner of doing. The expression in the contract that the plaintiff " is to load and unload said stock at his own risk," is obviously used in this sense and no other. This is rendered plain and certain by referring to the other portions of the provisions, and contemplating it in its entire scope. The unloading was at the plaintiff's risk, so far as the sufficiency of the means was concerned, and the care and skill in handling the animals during the process of unloading. He was to see that the platforms and shutes, or bridges, were of the right kind, and of sufficient strength, and in good repair and order.

So far it was his job and at his risk, but no further. The defendant was to furnish the means and facilities for the unloading, and the hands to do the work of unloading. In this view, I am of the opinion that the charge to the jury was entirely correct. There was evidence tending to prove that the plaintiff's agent requested the proper agents of the defendant to unload the cattle soon after the train was stopped at Dunkirk, and was promised that it should be attended to, and that the plaintiff's agent waited at the cars through the residue of the day after such request, and through the entire night, for defendant's agents to come, but none came. The defendant was, therefore, clearly in default. It is claimed for the defendant that the cars in which the plaintiff's cattle were could not have been moved up to the shute provided by the defendant for unloading the cattle, in consequence of the depth of the snow and the severity of the storm. The testimony on this subject was somewhat conflicting, but, assuming this to be so, the testimony shows without contradiction that a movable temporary platform could have been constructed with very little trouble, which would have answered every purpose for unloading with safety. If this was so, it came within the rule of reasonable care and diligence laid down in the charge. It is only necessary to examine the case far enough to see whether the charge and the refusals to charge as requested were right. The judge very properly refused to charge that if the plaintiff could have unloaded the cattle himself, and omitted to do so, he could not recover any damages that he might have prevented by such unloading himself. The court and jury could see plainly enough how this was. True, the plaintiff's witness and agent did say he could have unloaded the cattle himself. But he did not say he could have done it alone and unaided, and it was evident that he could not. It was, undoubtedly, possible for him to procure the materials for constructing platforms and bridges, and the necessary assistance to do the work of constructing them and getting the cattle out. It was in this sense, undoubtedly, that the witness spoke and was understood; and in this

Penn *v.* The Buffalo and Erie Railroad Company.

sense he might well say it was not his business, but the business of the defendant to do it. It was also, I suppose within the range of possibilities for him to have procured sufficient assistance to remove the trains in the way and the obstructions, and to have got the train containing his cattle up to the shute. But it was the defendant's business to do it, and the defendant cannot be permitted to say that the plaintiff might have done what it undertook to do, and thus have prevented the injury and damage, especially when the thing to be done necessarily involves considerable expense and labor. If it had been merely the opening of a door to let the cattle step out, it might be different. It is no answer whatever, for the defendant to say, that the plaintiff might have performed what it undertook to perform, and thus have avoided all injury and damage. The jury were charged, expressly, that it was for the plaintiff to prove that the injury arose from the neglect of the defendant to exercise due care and diligence, after being requested to unload the cattle. This the jury have, of course, found by their verdict. The defendant's counsel contends that there was no evidence before the jury to warrant any such finding, but that it appears, on the contrary, from the entire and undisputed evidence in the case that the cattle could not have been unloaded any sooner than they were. There was clearly evidence enough on that question to require the judge to submit the question to the jury as one of fact for them to determine; and we are not called upon to review the verdict upon the evidence to see where the preponderance lies. The judge was also requested to charge that the defendant was not liable on the ground that no such cause of action as negligence in not unloading, was set forth in the complaint. This request was properly refused. That was the only question which had been litigated as constituting the cause of action throughout the trial. It had been tried as a question arising under the pleadings, and it was too late, after all the evidence was closed, to object that no such question was before the court for trial. But the complaint is clearly broad enough to embrace that question.

It alleges that the defendant so carelessly and negligently conducted itself in and about the transportation of said cattle, that three of the number were, in consequence thereof, killed, destroyed and totally lost to the plaintiff; and that the residue of the said cattle were, by the careless and negligent conduct of the defendant in keeping and detaining them upon the cars in a crowded condition without food or water or care, and exposed to the elements, wounded, bruised, injured and depreciated in value. The specific act of negligence is not pointed out, nor was it necessary it should be. Enough was alleged to constitute a cause of action for negligence, and the defendant evidently knew what it was to meet. It is enough that the question was fairly litigated under the issue joined to justify the refusal to give such direction to the jury.

In the view I have taken, the duty and obligation of the defendant to unload or to furnish the means and assistance necessary for unloading, arose under the contract, and if it neglected to perform upon proper request, and damage ensued in consequence, a cause of action accrued to the plaintiff.

It is immaterial whether the defendant was to do the whole or only a material part, the result would be the same. The plaintiff's agent was there ready to do his part, and it was not done by reason of the neglect of the defendant's servants.

But the same duty, I should say, arose also outside of the contract, and independent of it, under the circumstances of the case. A condition of things had arisen not contemplated by the contract. The train had been arrested at a point where the defendant had no means or facilities for unloading stock, and, as is claimed in its behalf under such circumstances, that it could not, by the exercise of any reasonable care and diligence, obtain access for that train to the cattle yard and shute for unloading, sooner than it did. This may have been the view of the learned judge at the circuit, in ruling as it appears by the case he did rule and charge, that "notwithstanding such contract," the defendant would be liable if guilty of the negligence after notice.

In either view, I am of the opinion that the charge and the refusals were all correct, and that the judgment and order should be affirmed.

Judgment affirmed.